■ VARO, INC., Appellant, v ALVIS PLC et al., Respondents. IMO INDUSTRIES et al., Appellants, v ALVIS PLC et al., Respondents. [691 NYS2d 51] —Judgment, Supreme Court, New York County (Beatrice Shainswit, J.), entered September 4, 1997, which dismissed the complaint (Index No. 605927/96) as time barred pursuant to CPLR 213 (2) and (8), unanimously reversed, on the law, without costs, defendants' motion denied and the complaint reinstated.

Judgment, Supreme Court, New York County (Beatrice Shainswit, J.), entered September 4, 1997, which dismissed the complaint (Index No. 605928/96), unanimously affirmed, without costs.

These separate actions, which were never consolidated below, arise from certain provisions of a stock purchase agreement pursuant to which plaintiff IMO Industries, a Delaware corporation, purchased a company known as Optic-Electronics Corp. (OEC) from defendant Alvis PLC, a UK based company, which at the time of the agreement was known as United Scientific Holdings (USH), and United Scientific Inc. (USI), its wholly-owned subsidiary, for the sum of $38,000,000.

Section 5.2 of the agreement provided, in pertinent part: "The sellers hereby agree, jointly and severally, to indemnify and hold harmless the Purchaser and the Company from and against any losses, claims, damages * * * by reason of or

resulting from a breach or violation of any covenant, representation, warranty, indemnity or agreement of the Sellers hereunder." Among the representations made by the sellers was article II (I), which stated in relevant part, "the business of the Company and its Subsidiaries is not being and has not been conducted in violation of any law." At article II (P) the sellers further represented, "No illegal payment has been made by or on behalf of the Company or any Subsidiary which is in violation of any applicable Federal, state or local law."

In article II (X) the sellers further represented that the agreement did not contain any untrue statement of a material fact.

Article II (E) contained a representation that there were no contingent debts of the Company other than obligations incurred in the ordinary course of business.

The closing was held in New York on November 30, 1990, at which time adjustments were made reducing the purchase price to $33,656,000. An additional payment of $2 million was to be made on the first anniversary of the closing. In July 1991, IMO merged OEC into its wholly-owned subsidiary, plaintiff Varo, Inc., a Texas corporation.

Subsequently, on November 21, 1991, USH, Varo and IMO executed a letter agreement whereby the $2 million balance due USH was reduced to $1,963,500, and, in exchange, IMO and Varo released USH and USI from certain obligations under the stock purchase agreement, namely: "Any and all indemnification obligations of the Sellers to the Purchaser and the Company under the Agreement, including without limitation under Article V thereof, shall be deemed terminated and of no further force and effect as of the date hereof * * * except to the extent not here relevant."

IMO and Varo allege that, sometime in April 1994, they became aware of the Government's investigation of them for violations of the Federal Foreign Corrupt Practices Act of 1977 (15 USC § 78dd-1 *et seq.*) in that OEC, before its acquisition by IMO, had made illegal payments to Egyptian officers responsible for awarding a contract to OEC. IMO's first notice of the investigation was receipt of a subpoena dated April 7, 1994. At a September 12, 1994 settlement meeting with the United States Department of Justice, plaintiffs claim, the Government specifically directed them not to reveal the existence of the investigation or the proposed settlement. On or about May 12, 1995, the Government commenced an action against OEC. On the same date, Varo, as OEC's successor, consented to the entry of a final judgment of permanent injunction. IMO claims to

have incurred substantial damages as a result of this investigation, including the loss of the sale of Varo's assets to a company known as TPG Partners, which had agreed to enter into the transaction prior to the consent judgment, but afterwards declined for fear of losing business with the Egyptian government. Eventually, Varo was sold by IMO to Litton Systems for $52,540,000, substantially less than the $71,840,000 which TPG had indicated a willingness to pay.

Plaintiffs further claim that, in April 1994, they first learned of violations by defendants of the Federal False Claims Act (31 USC § 3729 *et seq.*). This claim centered around allegations that defendants had falsified test reports concerning night vision equipment they manufactured and sold for military use, which resulted in a Department of Justice investigation and an eventual settlement of a *qui tam* proceeding brought by a whistleblower, pursuant to which IMO and Varo paid $2 million to the Federal Government and $122,000 to the whistleblower.

In Action No. 1, Varo alleges two causes of action. The first is for contractual indemnification for breach of the environmental warranty in the stock purchase agreement and the resultant damages totaling $560,000 awarded against it in the so-called *Crow* action, a Texas action, brought by the lessee of a Dallas industrial warehouse and manufacturing facility acquired by Varo pursuant to the stock purchase agreement, for the removal or cleanup of hazardous materials.

In granting defendants' motion to dismiss the action as time-barred by the six-year Statute of Limitations applicable to causes of action based on contractual obligations and fraud, the IAS Court found that such causes of action accrued when the stock purchase agreement was executed inasmuch as the environmental hazards existed at that time despite defendant's warranty and representations to the contrary. With respect to the fraud claim, the court found that it was nothing more than a restatement of the breach of contract claim and was thus entirely dependent on the existence of the environmental warranty in the stock purchase agreement. However, the IAS Court failed to distinguish sufficiently between a claim for a breach of warranty and a claim for indemnification. In this regard, it should be noted that plaintiff, in its amended complaint, interchanges allegations of breach of environmental warranty with claims for indemnification. It is thus possible that these confusing juxtapositions could have contributed to the IAS Court's apparent belief that the claims are for breach of the environmental warranty, and not indemnification. Neverthe-

less, the first cause of action is clearly a claim for indemnification. The pleadings characterize the action as one for contractual indemnity, and the amended complaint itself alleges that "Alvis and USI have failed and refused to assume the defense of the *Crow* action or otherwise to indemnify Varo for the damages which Varo sustained in connection with the *Crow* action".

"[I]t is well settled that a cause of action based upon a contract of indemnification does not arise until liability is incurred by way of actual payment" (*Travelers Indem. Co. v LLJV Dev. Corp.*, 227 AD2d 151, 154 [citations omitted]; *see also, McDermott v City of New York*, 50 NY2d 211, 217 ["(S)ince the cause of action is not complete until loss is suffered, familiar Statute of Limitations principles dictate that accrual occurs upon payment by the party seeking indemnity (citations omitted)"]). Inasmuch as nothing in this record even indicates that Varo has paid Crow for any of the damages incurred in conjunction with the litigation, the time within which to commence suit on its indemnification claim has not even begun to run. In any event, it did not accrue on May 31, 1990, the date of the stock purchase agreement.

With regard to the second cause of action, for fraud, it relies exclusively on the claim that the environmental warranty was false. It is clear, however, that the fraud is alleged to have occurred by virtue of the representations made in the environmental warranty. For instance, the amended complaint states, "The environmental warranty * * * was made by USH and USI either with knowledge that it was false or recklessly without any knowledge of its truth or falsity when it was made". Similar allegations are made that "the falsity of the environmental warranty was discovered by Varo after it had succeeded to the rights of OEC". It is thus evident that the claim for fraud does not arise out of collateral facts, but is merely duplicative of the claim for indemnification, since it "is based on the same facts as underlie the contract claim and is not collateral to the contract and no damages are alleged that would not be recoverable under a contract measure of damages" (*Morgan Knitting Mills v Reeves Bros.*, 243 AD2d 422, 423 [citations omitted]).

The practical problem presented by the deficiencies in the fraud claim is that, while it cannot stand separate and apart from the indemnification claim, defendants did not move to dismiss the fraud claim on the grounds of duplication or failure to state a separate cause of action. Rather, they only moved to dismiss on Statute of Limitations grounds. From a technical viewpoint, therefore, the fraud claim cannot be dismissed, since

a motion on Statute of Limitations grounds cannot be converted into a motion to dismiss for failure to state a cause of action, without the plaintiff first being given an opportunity to be heard or to replead (*see, McLearn v Cowen & Co.*, 60 NY2d 686, 689). Therefore, it would be premature to dismiss the fraud claim at this juncture, although plaintiff would not be prejudiced even if it were, since the same damages are sought in the indemnification claim.

Action No. 2 was commenced in November 1996, six and a half years after the stock purchase agreement dated May 31, 1990 was executed, and alleges that defendants secretly falsified test results and failed to report testing failures of their night vision devices, thus improperly qualifying for a Federal contract for the manufacture of such devices at the time of IMO's purchase of OEC. The complaint further alleges that illegal payments were made on behalf of OEC to various Egyptian government officials in violation of the stock purchase agreement. As a result, the complaint alleges, Varo was unable to complete its sale to TPG as a result of the breach of representations and warranties by USH and USI in the stock purchase agreement.

IMO's first cause of action alleges that defendants had made unqualified and material representations and warranties "with knowledge that they were untrue or recklessly without any knowledge of their truth" with the result that IMO incurred substantial damages, i.e., the difference in the true value of OEC's shares at the time of IMO's purchase and the amount paid for OEC; the loss of IMO's investment in OEC; the expenses incurred by IMO in attempting to mitigate its damages in connection with that loss; and the costs incurred by IMO in remedying OEC's illegal practices, viz., the falsifications of test results on its night vision devices and illegal payments made to the Egyptian government by the Ni-Tec division of OEC, including the costs of the Government investigations.

Varo, as the successor to OEC, alleges that it relied upon the fraudulent representations and warranties made by USH in the stock purchase agreement and, as a result, suffered substantial damages related to the Government's investigations.

On March 7, 1997, defendants moved to dismiss the complaint pursuant to CPLR 3211 (a) (5) on the ground that plaintiffs' causes of actions are time-barred under CPLR 213 (8). The IAS Court characterized the motion as one seeking to dismiss the action "as barred pursuant to contract and as untimely" and found that the plaintiffs had "released their re-

spective rights to indemnification for breach of the subject warranties in exchange for a purchase price reduction by defendants". The court further stated, "Plaintiffs do not contend that the agreement is ambiguous or does not govern the subject warranties, nor do they seek rescission. Therefore, the indemnification cause of action is dismissed as barred by the letter agreement". With respect to the fraudulent representation claim, the court stated: "The claim is nothing more than a restatement of the breach of warranty and indemnification claim and is entirely dependent upon the existence of the warranties in the stock purchase agreement. Therefore, the claim is not legally viable".

In its decision, the court unfortunately never discussed whether the claims were timely, thus giving rise to plaintiffs' argument on appeal that the court improperly dismissed the complaint for failure to state a cause of action, rather than on the grounds sought in the notice of motion.

As noted above, when a motion to dismiss is predicated on a claim of failure to state a cause of action, the plaintiff must be afforded an opportunity to seek leave to replead within the prescriptions of CPLR 3211 (e) (*see, McLearn v Cowen & Co., supra*, 60 NY2d, at 689). Since plaintiffs only submitted opposition to a motion to dismiss on Statute of Limitations grounds, they should have been afforded an opportunity to respond to defendants' claim that the complaint did not state a cause of action.

Accordingly, we agree with plaintiffs that it was error to grant the motion on a ground not raised by defendants in their moving papers (*see, Goldstein v Haberman*, 183 AD2d 807). However, we reject their contention that because they do not appeal from any ruling relating to the Statute of Limitations, there having been none, their appeal should be decided upon grounds other than the Statute of Limitations. While we could remand the matter for determination of the issue by the IAS Court, in the interests of judicial economy this Court may decide the issue.

The complaint seeks relief based on representations made in the stock purchase agreement dated May 31, 1990, with regard to the absence of any payments made by or on behalf of OEC in violation of any existing law; OEC's capacity to manufacture certain night vision devices; OEC's compliance, along with its subsidiaries, with governing laws; and the veracity of the representations made in the stock purchase agreement. Thus, the action sounds in contract and, under CPLR 213 (2), the applicable Statute of Limitations is six years. Therefore, since

the action was not commenced until November of 1996, it is time-barred, unless plaintiff's time for bringing suit is somehow tolled. In this regard, plaintiffs argue that they were precluded from bringing suit during the time in which the *qui tam* complaint was under seal, from March 29, 1995 through June 7, 1996, which encompassed the period during which the Statute of Limitations expired.

CPLR 204 (a) provides that where "the commencement of an action has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action must be commenced". While plaintiffs were not specifically stayed from commencing this action, the affidavit of Thomas Bird, executive vice president of IMO, submitted in opposition to the motion to dismiss, states, "Before the seal on the *qui tam* complaint was lifted, IMO and Varo could not disclose the matter to unauthorized persons, let alone bring a lawsuit about it". The affidavit further states, "The civil action, including the *qui tam* action, by the United States Government was not settled until July 15, 1996".

Although, "[a]s a matter of basic common sense, a plaintiff cannot be expected to commence an action while effectively precluded from pleading the necessary elements of his case. The courts are not free to extend the Statute of Limitations (*see*, CPLR 201), and certainly may not invent tolling provisions simply because to do so might seem necessary in order to avoid results thought to be unfortunate in particular cases" (*Roldan v Allstate Ins. Co.*, 149 AD2d 20, 33). Thus, tolls pursuant to CPLR 204 (a) have been found in cases where a plaintiff was prevented from bringing suit by court order or statute and "the 'spirit' of this section has been invoked to create a toll when considerations of basic equity call for it" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C204:1, at 302, citing *Roldan v Allstate Ins. Co., supra*).

Here, however, nothing in the Federal False Claims Act (31 USC § 3729 *et seq.*), which is relied upon by plaintiffs, prohibited them from timely commencing this action. 31 USC § 3730 (b) (2) merely provides that where a private citizen, in this case a whistleblower, brings a civil action in the name of the United States Government for false claims in violation of section 3729 for the person and for the Government (a *qui tam* action), the complaint shall be filed *in camera* and shall remain under seal for at least 60 days and shall not be served on the defendants, here the plaintiffs-appellants, until the court so orders. However, IMO and Varo acknowledge that they became

aware of the Government's investigation of them for the illegal payments in Egypt as early as April 1994 and, despite the Justice Department's admonition at the September 12, 1994 settlement meeting not to reveal the existence of that investigation or the proposed settlement, nothing prevented them from commencing this or any other action. Likewise, nothing in their May 1995 settlement of the Government's action against OEC for a permanent injunction, which resulted from that investigation, or the subsequent pendency and settlement of the *qui tam* action presented a bar to this action sufficient to toll the running of the Statute of Limitations pursuant to CPLR 204 (a).

With regard to the fraud claim alleged on behalf of Varo, in the second cause of action, it is based on the same facts as the underlying contract claim, and is not collateral to the contract. Thus, no matter how it is designated, it is a contract claim, and therefore, is also barred by the six-year contract period of limitations (*see, Morgan Knitting Mills v Reeves Bros.,* 243 AD2d 422, *supra*).

We have considered plaintiffs' other points on both appeals and find them unpersuasive. Concur—Williams, J. P., Tom, Lerner and Andrias, JJ.