OPINION OF THE COURT
Shirley Werner Kornreich, J.
This court’s decision and order disposing of defendants’ motion to dismiss (motion sequence 003), dated July 30, 2010, excluding the order directing defendants to answer the complaint, and this court’s order, dated January 26, 2011, reinstating plaintiff’s jury demand upon reargument, are vacated, sua sponte, and this decision and order is substituted in their place.
This action arises out of an insurance policy issued by plaintiff MBIA Insurance Corporation (MBIA) to guarantee payments of principal and interest due to the Home Equity Mortgage Trust Series 2007-2 (the Trust). The Trust assets consist of residential second mortgages, which were securitized and sold to investors as residential mortgage-backed securities. The complaint seeks damages for losses suffered by MBIA, allegedly as a result of fraudulent misrepresentations and breaches of contractual *760 representations and warranties that led it to issue the policy, as well as damages for other breaches of contract. The defendants are Credit Suisse Securities (USA) LLC (CS Securities), DLJ Mortgage Capital, Inc. (DLJ and together with CS Securities, Credit Suisse) and Select Portfolio Servicing, Inc. (SPS) — affiliated entities under common control.
Defendants move to dismiss the following causes of action: fraudulent inducement against CS Securities (1st); breach of representations and warranties in the Insurance Agreement and Pooling and Servicing Agreement against DLJ (2nd); breach of the implied duty of good faith and fair dealing against DLJ and SPS (4th); breach of the Insurance Agreement against DLJ (5th); indemnification for breach of the Insurance Agreement against DLJ (7th); and reimbursement under the Insurance Agreement against DLJ (8th). Defendants also move to strike MBIA’s pleas for punitive damages, consequential damages and a jury trial. The grounds for the motion are failure to state a claim and dismissal based upon documentary evidence. (CPLR 3211 [a] [1], [7].)
Facts
In this motion to dismiss, the following facts are gleaned from the allegations in the complaint, plaintiff’s affirmations and the submitted documents annexed to them. In addition, the court has considered full copies of the transaction documents, which include the Insurance Agreement, dated April 30, 2007; the Pooling and Service Agreement, dated April 1, 2007 (PSA); a prospectus, dated April 1, 2007 (Prospectus); a prospectus supplement, dated April 27, 2007 (ProSupp); and a loan schedule. Copies of the full agreements and the loan schedule were supplied to the court by MBIA’s attorneys, with defendants’ consent, on February 1, 2011 (e-filed documents 80 to 85).
MBIA alleges that in 2007, CS Securities, DLJ and SPS consummated a transaction to securitize approximately 15,000 closed-end, second-lien residential mortgages (the Transaction) (complaint 1111 2, 3, 21). DLJ, as “sponsor,” aggregated the loans into a loan pool which was transferred to the Trust (complaint UK 1-2). The Trust was formed to issue securities that were to be paid down based on the cash flow from the loans (complaint 1i 2). SPS serviced the loans by, inter alia, collecting the mortgage payments, monitoring the performance of the borrowers and pursuing delinquent borrowers (id.). CS Securities, as underwriter for the public offering, marketed the securities to investors (id.).
*761 To enhance the marketability of the securities, CS Securities solicited, and DLJ and SPS contracted with, MBIA to issue a financial guaranty insurance policy, dated April 30, 2007 (Policy), to guarantee “unconditionally and irrevocably” the payment of interest and ultimately the principal of the loans relating to certain classes of certificates[1] (complaint 1Í1). MBIA asserts that the basic bargain between the parties was that Credit Suisse was to bear the risk that the securitized loans conformed to their representations regarding their quality and attributes, including representations that they were originated pursuant to specified practices and controls. MBIA was to bear the risk relating to whether the loans conforming to those representations would perform as expected in the prevailing market conditions (complaint 1f1f 8, 42).
Tim Kuo, vice-president of CS Securities, initially contacted MBIA about the Transaction on or about March 2, 2007 (complaint If 21). Mr. Kuo indicated that the Transaction would close later that month, although the complaint admits that the Transaction did not close until the end of the following month, i.e., April 30, 2007 (complaint 11 22 n 3). Mr. Kuo said that MBIA would have to decide quickly whether to participate (complaint If 22). The complaint admits that MBIA had reservations about the Transaction because: (1) it had never previously insured mortgage-backed securities for Credit Suisse, particularly its Home Equity Mortgage Trust (HEMT) platform; and (2) it had concerns regarding one of the loan originators, New Century Mortgage Corporation (New Century) (complaint Hit 23, 24).
It is undisputed that prior to entering into the Transaction, CS Securities provided MBIA with a loan schedule, or “tape,” which set forth information about each loan, including attributes of the borrowers’ creditworthiness, such as their debt-to-income ratio (DTI), and attributes about the property serving as collateral for the loan, such as the combined loan-to-value ratio (CLTY¡ i.e., ratio between the combined first and second mortgage liens and the appraised property value at the time of origination) (complaint If 28) .[2] Also supplied to MBIA were the Prospectus and ProSupp (complaint If If 36, 44-45).
*762 The Prospectus and ProSupp
The Prospectus painted a less than rosy picture of the potential value of the Trust investment and the health of the residential real estate market. It disclosed that
“the mortgage loans may have been made to mortgagors with imperfect credit histories, ranging from minor delinquencies to bankruptcy, or mortgagors with relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income. Consequently, the mortgage loans may experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in accordance with higher standards.
“Recently, the residential mortgage market in the United States has experienced a variety of difficulties and changed economic conditions that may adversely affect the performance and market value of your securities. Delinquencies and losses with respect to residential mortgage loans generally have increased in recent months, and may continue to increase, particularly in the subprime sector. In addition, in recent months housing prices and appraisal values in many states have declined or stopped appreciating, after extended periods of significant appreciation. A continued decline or an extended flattening of those values may result in additional increases in delinquencies and losses on residential mortgage loans generally, particularly with respect to second homes and investor properties and with respect to any residential mortgage loans whose aggregate loan amounts (including any subordinate liens) are close to or greater than the related property values . . .
“A decline in housing prices may also leave borrowers with insufficient equity in their homes to permit them to refinance .... Furthermore, borrowers who intend to sell their homes on or before the expiration of the fixed rate periods on their mortgage loans may find that they cannot sell their properties for an amount equal to or greater than the unpaid principal balance of their loans. These events, alone or in combination, may contribute to higher delinquency rates . . .
*763 “If the real estate market should experience an overall decline in property values such that the outstanding balances of the mortgage loans and any secondary financing on the mortgaged properties in a particular mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry . . .
“Balloon Loans. A mortgagor’s ability to pay the balloon amount at maturity, which ... is expected to be a substantial amount, will typically depend on the mortgagor’s ability to obtain refinancing ... or to sell . . . prior to the maturity . . . The ability to obtain refinancing will depend on a number of factors prevailing at the time refinancing or sale is required, including, without limitation, real estate values, the mortgagor’s financial situation, the level of available mortgage loan interest rates, . . . the terms of any related first lien mortgage loan.” (Prospectus at 7, 8, 26, 29.)
With respect to the underwriting standards used by the originating banks, who made the loans to the borrowers, the Prospectus warned that
“[t]he underwriting standards applicable to the mortgage loans typically differ from, and are, with respect to a substantial number of mortgage loans, generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac primarily with respect to original principal balances, loan to value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types. To the extent the programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans thereunder may reflect higher delinquency rates and/or credit losses. In addition, certain exceptions to the underwriting standards described herein are made in the event that compensating factors are demonstrated by a prospective borrower” (Prospectus at 31).
The Prospectus disclosed that “[i]n the case of certain borrowers with acceptable payment histories, no income will be required to be stated (or verified) in connection with the loan *764 application” (id.). It further disclosed that “[b]ased on the data provided in the application and certain verification (if required),” the original lender would determine if the mortgagor’s monthly income was sufficient to meet its obligations on the loan and other expenses (id.).
The Prospectus specifically disclosed that some of the mortgage loans had been originated under alternative documentation, reduced documentation, stated income/stated assets or no income/no asset programs (Prospectus at 32). The Prospectus revealed the nature of such programs, i.e., that in an “alternative documentation” program, alternatives to standard forms are used to verify income and assets; in a “reduced documentation” program, an originator does not verify the mortgagor’s stated income or the mortgagor’s assets; in a “stated income/stated assets program,” an originator does not verify the stated income or assets on a mortgagor’s loan application, but a “reasonableness test” is applied; and in a “no income/no asset” (NINA) program, the mortgagor does not state his income or assets on the loan application and the originator does not verify them (Prospectus at 33).
The ProSupp stated that DLJ originated 34.43% of the loans, New Century originated 14.87% and no other entity originated more than 10% (ProSupp at S-4). The ProSupp also disclosed that the average CLTV of the Group 1 and Group 2 loans was 99.52% and 97.02%, respectively (ProSupp at S-24, S-26). The ProSupp stated the number of Group 2 loans that were secured by investment properties and secondary residences (ProSupp at S-27).
With respect to underwriting standards, the ProSupp represented that DLJ had acquired its loans from originating banks that it “ha[d] determined met its qualified correspondent requirements” (ProSupp at S-33). The ProSupp represented that the standards for mortgage loans purchased in accordance with DLJ’s qualified correspondent loan requirements included that the mortgage loans were originated “in accordance with underwriting guidelines designated by the sponsor [DLJ] (‘Designated Guidelines’) or guidelines that do not vary materially from such Designated Guidelines”; that the Designated Guidelines were designated by DLJ on a consistent basis for use by originators in originating mortgage loans for DLJ; that DLJ employed certain quality assurance procedures designed to ensure that the qualified correspondents properly applied the underwriting criteria designated by DLJ; and that the Desig *765 nated Guidelines were substantially similar to the guidelines described in the Prospectus under “Trust Funds — Underwriting Standards — Single and Multi-Family Mortgage Loans” (id.). That portion of the Prospectus is the part that revealed that some of the loans were originated under programs with less than stringent underwriting standards, i.e., alternative documentation, reduced documentation, stated income/stated assets and NINA programs (Prospectus at 30-33).
The ProSupp did not represent that loans originated by New Century met DLJ’s Designated Guidelines or that New Century met DLJ’s qualified correspondent requirements. Instead, the ProSupp disclosed that New Century had filed for bankruptcy, which might have adversely affected its ability to originate mortgage loans in accordance with its customary standards and to exercise oversight and control over its originations (ProSupp at S-20). The ProSupp warned that “[accordingly, the rate of delinquencies and defaults on these mortgage loans [New Century’s] may be higher than would otherwise be the case” (id.).
The ProSupp elaborated on the risks of the Trust investment in a special section entitled “Risk Factors” (ProSupp at S-10 et seq.). The risks included that: all of the mortgage loans were second liens, subordinate to first mortgage liens, which might make foreclosure of the second lien uneconomical in the event of default — leading to write-offs; more than half of the loans were balloon loans, requiring the mortgagor to pay or refinance a lump sum at the end of the loan term, failing which the investor might suffer a loss; and more than a third of the loans charged fees for partial or full prepayment (ProSupp at S-10, S-15).
MBIA alleges that because of the short time frame, it was impossible for it to review the individual loan files in the pool to determine whether each borrower could repay (complaint lili 22, 42). Instead, MBIA says that it chose to rely upon extracontractual representations made by CS Securities, as well as contractual representations and warranties made in the Insurance Agreement, the PSA, the Prospectus and the ProSupp (complaint U1Í 39, 42-48).
Alleged Extracontractual Representations
There are various extracontractual representations by CS Securities alleged in the complaint, upon which MBIA says it relied in issuing the Policy. CS Securities made representations about *766 its reputation in the financial industry and its successful track record with prior securitizations, particularly its HEMT shelf, which was touted in a presentation and a March 22, 2007 e-mail (complaint 11 27). Regarding New Century, CS Securities allegedly represented that “Credit Suisse itself was backing” the New Century loans (complaint 1Í 25). Later in the complaint, MBIA explains that CS Securities represented that it “would vouch for the New Century loans by providing express contractual representations and warranties about their quality” (complaint H 30). CS Securities allegedly assured MBIA that Credit Suisse had conducted rigorous due diligence consisting of an individualized review of thousands of the loans included in the pool, during which it rejected a large number of loans, to ensure compliance with “strict” underwriting guidelines created or approved by Credit Suisse (complaint 1i1i 28-29). Mr. Kuo sent MBIA spreadsheets to document Credit Suisse’s due diligence (complaint 1i 29).
Documentary Evidence
The Pooling and Service Agreement
The parties to the PSA are DLJ and SPS, as well as nonparties Credit Suisse First Boston Mortgage Securities Corp. and U.S. Bank National Association (US Bank), the trustee of the Trust.
MBIA claims that DLJ breached “loan-level” warranties made in the PSA, section 2.03 (d), which incorporates the warranties in schedule IV The representations and warranties included the following:
“(iv) The Mortgage Loan complies with all the terms, conditions and requirements of the originator’s underwriting standards in effect at the time of origination of such Mortgage Loan, which in all material respects are in accordance with customary and prudent underwriting guidelines used by originators of closed-end second lien mortgage loans.
“(v) The information set forth in the Mortgage Loan Schedule, attached to the Agreement as Schedule I [the loan tape], is complete, true and correct in all material respects as of the Cut-off Date.
“(ix) To the knowledge of the Seller [DLJ]:
*767 “(j) With respect to any Group I Loan,[3] the methodology used in underwriting the extension of credit of each such Mortgage Loan did not rely solely on the extent of the Mortgagor’s equity in the collateral as the principal determining factor in approving such extension of credit but instead employed related objective criteria such as the Mortgagor’s income, assets and liabilities, to the proposed mortgage payment and, based on such methodology, the Mortgage Loan’s Originator made a reasonable determination that at the time of origination the Mortgagor had the ability to make timely payments on the Mortgage Loan . . .
“(xliv) The origination, underwriting, servicing and collection practices with respect to each Mortgage Loan have been in all respects legal, proper, prudent and customary in the mortgage lending and servicing business, as conducted by prudent lending institutions which service mortgage loans of the same type in the jurisdiction in which the Mortgaged Property is located” (PSA, schedule IV at HH-5, HH-8, HH12 [emphasis supplied]).
Section 1.01 of PSA defined the mortgage loan schedule as schedule I of the PSA and stated that it included information about the loans, including the borrowers’ DTI and credit score, and the CLTV and occupancy status of the mortgaged properties (PSA § 1.01 at 24-26). MBIA alleges that the loan-level representations and warranties were breached by, inter alia, loans made to borrowers who falsely stated their income, or who did not demonstrate a reasonable ability to repay the loans (complaint 1i 49).
SPS promised to “service and administer the Mortgage Loans in accordance with the terms of the [PSA] and with Accepted Servicing Practices” (PSA § 3.01). “Accepted Servicing Practices” is defined as: “With respect to any Mortgage Loan, mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located” (PSA § 1.01 at 1). SPS was prohibited from “taking an action that is materially inconsistent with or materially prejudices the interests” of MBIA (PSA § 3.01). SPS also promised to give MBIA “reasonable access to *768 all records and documentation regarding the Mortgage Loans and all accounts, insurance information and other matters relating to this Agreement” (PSA § 3.07 [a]). SPS was required to “charge off’ loans when they were 180 days delinquent (PSA § 3.11 [a] [iii]). The trustee was to track collections received by SPS on charged-off loans, and SPS was to send a copy of the trustee’s reports to MBIA (PSA § 3.11 [a] [iv]). Charged-off loans could be serviced by a special servicer appointed by the Class X-l certificate holder upon notice to, and with the approval of, MBIA (PSA § 1.01 at 45; § 3.11 [a] [iii]; § 3.22 [a]). If SPS did not anticipate a net recovery[4] after up to six months of efforts to collect by the special servicer, a charged-off loan was to be transferred to the Class X-2 certificate holders and released from the Trust (PSA § 3.11 [a] [iv]). The appointed special servicer could, but was not obligated to, purchase delinquent loans from the Trust (PSA § 3.22 [c]). If it did, the purchase price had to be deposited in the Trust’s bank account (PSA § 3.22 [c]). It is a default under the PSA for SPS to fail to make any deposit or payment, to perform any material obligation that materially affects MBIA, or to breach a representation or warranty (PSA § 7.01).
With respect to remedies, DLJ promised, upon notice of any material breach of a representation or warranty, to cure the breach or repurchase the breaching loan from the pool (the Repurchase Protocol):
“Upon discovery by any of the parties hereto of a breach of a representation or warranty made pursuant to Section 2.03 (d) that materially and adversely affects the interests of the Certificateholders and the Certificate Insurer in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties and the Certificate Insurer. The Seller [DLJ] hereby covenants that within 90 days of the earlier of its discovery or its receipt of written notice by any party of a breach of any representation and warranty made by it pursuant to Section 2.03 (d) which materially and adversely affects the interests of the Certificateholders or the Certificate Insurer in any Mortgage Loan sold by the Seller to the Depositor, it shall cure such breach in all material respects, and if such breach is *769 not so cured, shall, (I) if such 90-period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan . . . from the Trust Fund and substitute in its place a Qualified Substitute Mortgage Loan ... or (ii) repurchase the affected Mortgage Loan from the Trustee” (PSA § 2.03 [e]).
Under the PSA, the sole remedy for breaches of representations and warranties is the Repurchase Protocol (PSA § 2.03 at 72).
The Insurance Agreement
The parties to the Insurance Agreement are MBIA and defendants DLJ and SPS, as well as nonparties Credit Suisse First Boston Mortgage Securities Corp. and US Bank.
The representations and warranties by DLJ and SPS in the Insurance Agreement included the following:
“(j) Accuracy of Information. Neither the Transaction Documents nor other material information relating to the Mortgage Loans, the operations of the Servicer [SPS], the Seller [DLJ] or the Depositor (including servicing or origination of loans) or the financial condition of the Servicer, the Seller or the Depositor or any other information (collectively, the “Documents”), as amended, supplemented or superseded, furnished to the Insurer by the Servicer, the Seller or the Depositor contains any statement of a material fact by the Servicer, the Seller or Depositor which was untrue or misleading in any material adverse respect when made . . .
“(k) Compliance with Securities Laws. The offer and sale of the Securities comply in all material respects with all requirements of law .... Without limitation of the foregoing, the Offering Document [the Prospectus and ProSupp] does not contain any untrue statement of a material fact and does not omit to state a material fact necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading; provided, however, that no representation is made with respect to the Insurer Information. Neither the offer nor the sale of the Securities has been or will be in violation of the Securities Act or any other federal or state securities laws.
“(I) Transaction Documents. Each of the representations and warranties of the Servicer, the Seller *770 and the Depositor contained in the Transaction Documents to which they are, respectively, a party is true and correct in all material respects, and the Servicer, the Seller and the Depositor hereby make each such representation and warranty to, and for the benefit of, the Insurer as if the same were set forth in full herein. The remedy for any breach of this paragraph with respect to representations and warranties as to the Mortgage Loan shall be limited to the remedies specified in the related Transaction Documents.” (Insurance Agreement § 2.01.)
The Insurance Agreement incorporated the representations and warranties in the PSA because the Insurance Agreement defined “Transaction Documents” to include the PSA (Insurance Agreement, art I, at 4). The Insurance Agreement also represented and warranted the accuracy of the facts represented in the Prospectus and ProSupp because the Insurance Agreement defined “Offering Document” as the Prospectus and Pro-Supp (Insurance Agreement, art I, at 3). MBIA alleges that the “transaction-level” warranties in the Insurance Agreement represented the accuracy of the information provided by DLJ concerning its mortgage loans, the Credit Suisse loan-acquisition practices, underwriting guidelines, due diligence and marketing practices — the last of which was in the Prospectus and ProSupp (complaint 1Í1Í 36, 43-45).
An event of default by DLJ and SPS under the Insurance Agreement included any untrue material representation or warranty in the Insurance Agreement and PSA. Additionally, it included the failure to pay any amount due to MBIA and any material breach of the Insurance Agreement or PSA if not cured within the required time period (Insurance Agreement § 5.01).
With respect to remedies, the Insurance Agreement provides that in the event of a default, MBIA may seek any remedy “at law or in equity as may appear necessary or desirable in its judgment to collect the amounts then due under the Transaction Documents” (Insurance Agreement § 5.02). Moreover, the Insurance Agreement states that MBIA’s remedies “shall be cumulative and shall be in addition to other remedies given under the Transaction Documents or existing at law or in equity” (Insurance Agreement § 5.02). Further, MBIA has the right to reimbursement for payments made under the Policy, including reasonable attorneys fees, accountant fees and expenses, if: DLJ fails to follow the Repurchase Protocol or MBIA has to enforce its rights under the PSA and the Insurance Agree *771 ment (Insurance Agreement § 3.03). MBIA also has the right to indemnification for misrepresentations in the Prospectus, Pro-Supp, the PSA and the Insurance Agreement, including reasonable fees and expenses of attorneys, consultants, auditors and investigations (Insurance Agreement § 3.04 [a] [i], [vi]).
Defendants’ Alleged Defaults
MBIA alleges that there were inordinate defaults under the loans and it retained a third-party consultant to review them for compliance with Credit Suisse’s representations and warranties (complaint lili 68-72). The consultant determined that out of a sample of 1,386 defaulted loans with an aggregate principal balance of approximately $78.1 million, breaches had occurred in 87% of them (id.). A review of a sample of 477 randomly-selected loans from the Transaction, including loans not in default, revealed breaches in 79% of the cases (id.). The breaching loans contained one or more defects that constituted a breach of one or more of defendants’ representations and warranties and pervasive violations of the originators’ underwriting standards set forth in the Prospectus and ProSupp, as well as prudent and customary underwriting practices, including:
“(i) qualifying borrowers under reduced documentation programs who were ineligible for those programs; (ii) systemic failure to conduct the required income-reasonableness analysis for stated income loans, resulting in the rampant origination of loans to borrowers who made unreasonable claims as to their income and (iii) lending to borrowers with debt-to-income and loan-to-value ratios above the allowed máximums;
“rampant fraud, primarily involving misrepresentation of the borrower’s income, assets, employment, or intent to occupy the property as the borrower’s residence (rather than as an investment), and subsequent failure to so occupy the property; and “failure by the borrower to accurately disclose his or her liabilities, including multiple other mortgage loans taken out to purchase additional investment property[; and]
“failure of the Prospectus and ProSupp to accurately disclose the loan attributes, such as CLT\[ occupancy status or DTI and the deficient underwriting and origination practices permeating the loan pool” (id.).
*772 In addition, MBIA alleges that DLJ breached its obligations under the Repurchase Protocol. MBIA provided notice to Credit Suisse of 564 breaching loans that it uncovered, but Credit Suisse refused to cure or repurchase a single loan (complaint 1iH 76-77). MBIA asserts that because of Credit Suisse’s misrepresentations and contractual breaches, MBIA has incurred and continues to incur significant damages, including the $296 million in claims it has paid out so far (complaint 1I1Í 78-79). MBIA alleges that it would not have participated in the Transaction had it been aware of Credit Suisse’s fraud (id.).
MBIA also commissioned a third-party consultant to review SPS’s work as servicer. The review revealed that SPS breached its contractual obligations by failing to have appropriate personnel or procedures in place, and by doing virtually nothing to collect on delinquent loans (complaint 1Í1Í 73-74). MBIA alleges that SPS reduced staff as defaults mounted and improperly released more than 2,000 charged-off loans to the Class X-2 certificate holders, without notice to MBIA, and without a good faith effort to collect from the borrower (complaint 1111 60-67). As a consequence of the release, MBIA was improperly denied access to those files in order to determine whether the loans complied with the representations and warranties (complaint H 66). Furthermore, the transfer improperly diverted to Credit Suisse assets from the Trust that could have been used to offset future payments MBIA must make under the Policy (complaint H 67). MBIA also asserts that SPS made an agreement to split its fees with DLJ, leaving it inadequate resources to do its job (complaint 11 61). Lastly, MBIA claims that when it sought to exercise its contractual right to access the loan origination files, SPS at first falsely denied having the requested files, and then refused to produce them under a variety of pretexts (complaint HH 58-59). MBIA gained access to the files only after it terminated SPS as servicer (complaint H 62).
Discussion
In deciding a motion to dismiss pursuant to CPLR 3211 (a) (7), the court must afford the pleadings a liberal construction, accept the allegations of the complaint as true and give the plaintiff the benefit of every favorable inference. (EBC I, Inc. v Goldman, Sachs & Co., 5 NY3d 11 [2005].) However, “allegations consisting of bare legal conclusions as well as factual claims either inherently or flatly contradicted by the documentary evidence are not entitled to such consideration.” (Stuart Lipsky, P.C. v Price, 215 AD2d 102, 103 [1st Dept 1995].)
*773 Fraudulent Inducement (First Cause of Action)
The fraudulent inducement claim against CS Securities states that it made “materially false statements and omitted material facts in email communications with MBIA with intent to defraud” (complaint 1Í 81). In moving to dismiss the fraudulent inducement claim, defendants argue that it duplicates the breach of contract action; that the representations about Credit Suisse’s “pedigree” and the success of its HEMT shelf are “puffery” that is not actionable as fraud; and that MBIA cannot prove justifiable reliance as a matter of law. Regarding justifi,able reliance, defendants argue that MBIA: (1) failed to conduct due diligence (complaint If 42); (2) received contrary representations and warranties in the contractual documents that did not excuse it from its duty of inquiry; and (3) was on notice of the various deficiencies of the loans that were contained in the loan tape, the Prospectus and the ProSupp and, therefore, could not justifiably rely on alleged contrary representations made by CS Securities. Further, defendants argue that they had no unique knowledge that they withheld from MBIA.
The elements of a claim for fraudulent inducement are: (1) a false representation of material fact, (2) known by the utterer to be untrue, (3) made with the intention of inducing reliance and forbearance from further inquiry, (4) that is justifiably relied upon, and (5) results in damages. (Schumaker v Mather, 133 NY 590, 595 [1892].)
MBIA’s allegations about Credit Suisse’s pedigree and HEMT shelf track record, which MBIA allegedly relied upon as a prediction of the Trust’s performance, are not fraud. Puffery, opinions of value or future expectations do not support a cause of action for fraud. (Sidamonidze v Kay, 304 AD2d 415 [1st Dept 2003]; Longo v Butler Equities II, 278 AD2d 97 [1st Dept 2000].)
The complaint admits that MBIA did not do its own due diligence and that instead of doing due diligence, it relied on representations made by CS Securities prior to closing and express representations and warranties made by DLJ in the Insurance Agreement and PSA (complaint 1Í1Í 26-30, 32, 39). However, defendants’ argument that, as a matter of law, MBIA was not justified in relying on defendants’ contractual representations and warranties, instead of doing its own due diligence, is foreclosed by the Court of Appeals decision in DDJ Mgt., LLC v Rhone Group L.L.C. (15 NY3d 147, 154-156 [2010]). DDJ holds that it is a question of fact whether a sophisticated party reasonably *774 relies on facts contained in a bargained-for contractual representation.
Nonetheless, to the extent that MBIA alleges that it relied on contractual representations and warranties in the Insurance Agreement and PSA, the fraud claim duplicates the breach of contract claims and must be dismissed. To sustain a claim for fraudulently inducing a party to contract, the plaintiff must allege a representation that is collateral to the contract, not simply a breach of a contractual warranty, and damages that are not recoverable in an action for breach of contract. (RGH Liquidating Trust v Deloitte & Touche LLP, 47 AD3d 516 [1st Dept 2008], lv dismissed 11 NY3d 804 [2008] [fraudulent inducement duplicative because it alleged no misrepresentations collateral or extraneous to agreements]; Hawthorne Group v RRE Ventures, 7 AD3d 320, 323 [1st Dept 2004] [alleged misrepresentation should be one of then-present fact, extraneous to contract, and involve duty separate from or in addition to that imposed by contract]; Varo, Inc. v Alvis PLC, 261 AD2d 262 [1st Dept 1999] [duplicative because misrepresentations not collateral to contract]; J.E. Morgan Knitting Mills v Reeves Bros., 243 AD2d 422 [1st Dept 1997] [fraudulent inducement duplicative because based on same facts as contract claim, not collateral to contract and all damages recoverable for breach of contract]; Krantz v Chateau Stores of Canada, 256 AD2d 186 [1st Dept 1998] [fraud claim dismissed as duplicative of breach of contract claim]; cf. GoSmile, Inc. v Levine, 81 AD3d 77, 83 [1st Dept 2010] [fraud claim sustained because “many ‘additional’ facts” in addition to warranty misrepresented]; RAG Am. Coal Co. v Cyprus Amax Mins. Co., 299 AD2d 259 [1st Dept 2002] [fraud claim sustained because it relied on representations not contained in contractual warranty].)
DDJ is not controlling on the issue of duplication because, as the lower court opinion makes clear, there was no breach of contract claim in DDJ. (DDJ Capital Mgt., LLC v Rhone Group L.L.C., 19 Misc 3d 1124[A], 2008 NY Slip Op 50839[U] [Sup Ct, NY County 2008].) In addition, First Bank of Ams. v Motor Car Funding (257 AD2d 287, 292 [1st Dept 1999]), which is cited by MBIA, also is distinguishable from this case because the alleged misrepresentations there differed from the contractual warranty. The agreement in First Bank gave the plaintiff a right to purchase certain loans over a period of time in the future. In the contract, the defendant warranted that the loans would conform to certain underwriting guidelines. The alleged false *775 representations concerned collateral for the loans, that were made by the defendants after the contract was signed, as the defendants sold the loans to the plaintiff.
Here, MBIA’s claims duplicate the second cause of action for breach of contractual representations and warranties in the Insurance Agreement and PSA to the extent that MBIA claims: that it was fraudulently induced because the loans did not conform to the originators’ underwriting guidelines; that the loans purchased from originating banks, other than New Century, did not conform to Credit Suisse’s Designated Guidelines; that the information on the loan tape was inaccurate; that the Prospectus and ProSupp did not adequately disclose information about the loans; and that Credit Suisse would back or vouch for the New Century loans by providing express contractual representations and warranties. The accuracy of the Prospectus and ProSupp was warranted in the Insurance Agreement. The Insurance Agreement contained representations as to the accuracy of the information about DLJ’s operations in the ProSupp, which included that, except for New Century, the qualified originating banks’ underwriting guidelines had to conform to the Credit Suisse Designated Guidelines. The PSA represented that the loans would conform to the originators’ underwriting guidelines and warranted the accuracy of the loan tape, which included information about DTI, CLTV and occupancy status. The Prospectus or ProSupp represented the maximum CLTV[ the number of second homes and investment properties, and that originators applied a reasonableness test for stated income.
Other allegations allegedly constituting fraud are elaborations on the failure of originators to follow their underwriting standards or the inaccuracy of the loan tape, the subjects of contractual warranties. Specifically, the additional allegations subsumed by the contractual warranties include: qualifying buyers who made false statements on loan applications, i.e., about income, assets, liabilities, intent to occupy; loans made in violation of maximum DTI and CLTV; and stated income that was not subjected to a reasonableness test.
If the alleged statements were inaccurate in any material respect, the damages sought by MBIA are recoverable in a breach of contract action, including its claims for indemnification and reimbursement of litigation costs. (See discussion below.) Additionally, an unelaborated request for punitive damages is not enough to make the damages recoverable for fraud different *776 from contract damages. (Krantz v Chateau Stores of Canada, 256 AD2d 186 [1st Dept 1998].) Here, plaintiffs damages not recoverable under the contracts are unspecified “equitable damages,” a bare-bones, conclusory request insufficient to undermine the holding that the fraud claim is duplicative of the breach of contract claim. (Id.)
The extracontractual allegation that CS Securities represented that the loans, including the New Century loans, complied with “strict” Credit Suisse underwriting guidelines, cannot sustain the fraudulent inducement claim. MBIA was notified of the facts and chose to go forward with the Transaction without protecting itself by investigation or a bargained-for contractual warranty as to “strict” guidelines. (DDJ, 15 NY3d at 153-154, quoting Schumaker v Mather, 133 NY 590, 596 [1892] [“ ‘(I)f the facts represented are not matters peculiarly within the party’s knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations’ ”]; Lampert v Mahoney, Cohen & Co., 218 AD2d 580, 582 [1st Dept 1995]; Rodas v Mandaras, 159 AD2d 341 [1st Dept 1990] [fraud dismissed despite refusal of plaintiffs’ request for inspection of financial records].)
Thus,
“where ... a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented.” (Id. at 343; see also Global Mins. & Metals Corp. v Holme, 35 AD3d 93 [1st Dept 2006], lv denied 8 NY3d 804 [2007] [New York law imposes affirmative duty on sophisticated investors to protect themselves from misrepresentations made during business acquisitions by obtaining prophylactic contractual warranty or investigating details of transaction]; Rigney v McCabe, 43 AD3d 896 [2d Dept 2007] [representation of fact known to plaintiff not actionable as fraud].)
Moreover, where a sophisticated party has hints of falsity, its duty of inquiry is heightened and if it fails to investigate or *777 insert protective language in the contract, it willingly assumes the risk that the facts are not as represented. (Global Mins. & Metals Corp. at 100.)
Here, the Prospectus disclosed that some of the loans were originated under programs with less than “strict” underwriting standards, i.e., alternative documentation, reduced documentation, stated income/stated assets and NINA programs (Prospectus at 30-33). The ProSupp disclosed that New Century had filed for bankruptcy, which might have adversely affected its ability to originate mortgage loans in accordance with customary standards and to exercise oversight and control over originations (ProSupp at S-20). MBIA assumed the risk of less than “strict” underwriting standards by forgoing due diligence or a contractual representation and warranty to protect itself. This case is stronger than Rodas because the complaint admits that MBIA had the Prospectus and ProSupp, which disclosed the risks of which it now complains, whereas in Rodas the plaintiffs’ request for disclosure of financial records had been refused. (Rodas, supra; cf. DDJ, 15 NY3d at 154-155.) Then too, the complaint admits that MBIA was alert to possible problems with New Century as an originator, which heightened its obligation of diligent inquiry (complaint K 24; Global Mins. & Metals Corp., supra).
The alleged precontractual representation that CS Securities had conducted rigorous due diligence consisting of an individualized review of thousands of the loans included in the pool, during which it rejected a large number of loans to ensure compliance with “strict” underwriting guidelines created or approved by Credit Suisse, does not save the fraud claim. The only material part of the alleged representation is the result of the due diligence, i.e., that the loans complied with “strict” underwriting standards, which is not actionable due to MBIA’s notice of contrary facts, lack of due diligence and failure to obtain a warranty. That Credit Suisse did due diligence and rejected loans not insured by MBIA was not material to the Transaction.
In sum, MBIA’s first cause of action for fraud is dismissed. The alleged fraud in the inducement either duplicates the cause of action for breach of contractual representations and warranties in the second cause of action; cannot be maintained because MBIA, a sophisticated business entity, failed either to investigate material facts disclosed in documents admittedly in its possession or obtain contractual warranties; or the alleged misrepresentations were not material or amounted to nonactionable opinions of value or future expectations.
*778 Breach of Contract Claims (Second and Fifth Causes of Action)
In moving to dismiss the contract claims under the Insurance Agreement and PSA, defendants assert that MBIA has failed to specifically allege a breach of representation or warranty with respect to any particular loan (i.e., failure to identify thousands of loan-level breaches). The motion to dismiss the second and fifth causes of action for lack of specificity is denied. Under, CPLR 3013, a party bringing an action for breach of contract need only provide notice of the transactions or occurrences underlying the claim. Particularity in a contract action is not required. (Shilkoff, Inc. v 885 Third Ave. Corp., 299 AD2d 253, 254 [1st Dept 2002].) Plaintiff has alleged the existence of a valid agreement (the Insurance Agreement and PSA); that defendants breached particular provisions of those agreements, including the representations and warranties; that MBIA has conducted a review that has revealed breaches in more than 80% of the loans reviewed; and that MBIA has been harmed by, inter alia, payment of more than $296 million in claim payments. Although MBIA may ultimately be required to itemize the breaches constituting its contract claims, the pleadings give sufficient notice of the claim at this juncture.
Breach of the Covenant of Good Faith and Fair Dealing (Fourth Cause of Action)
Defendants argue that the fourth cause of action for breach of the covenant of good faith and fair dealing by DLJ and SPS must be dismissed because it duplicates the breach of contract claims. Every contract implies a promise that neither party will do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract. (Dalton v Educational Testing Serv., 87 NY2d 384, 389 [1995].) However, causes of action for breach of contract and breach of the covenant of good faith and fair dealing may stand together where the defendant engages in conduct that injures or frustrates the other party’s right to receive the fruits of the contractual bargain. (Frydman & Co. v Credit Suisse First Boston Corp., 272 AD2d 236 [1st Dept 2000].)
Here, except for the allegations that SPS at first falsely denied having the files MBIA requested and then refused to produce them under a variety of pretexts (complaint U 59), there are no allegations relating to attempts to frustrate MBIA’s right to the fruits of the bargain. Consequently, the fourth cause of action is dismissed against DLJ but sustained as to SPS.
*779 Indemnification and Reimbursement (Seventh and Eighth Causes of Action)
Defendants seek to dismiss the indemnification and reimbursement claims solely on the ground that they are dependent upon the second and fifth causes of action for breach of the Insurance Agreement, which should have been dismissed. As the court has sustained those causes of action, the motion is denied. In addition, as previously noted, Insurance Agreement § 3.04 (a) provided MBIA with a contractual right to indemnification and reimbursement for some of the alleged breaches.
Punitive and Consequential Damages
The motion to strike the claim for punitive damages is granted because the complaint’s demand for punitive damages relates only to the now dismissed fraud claim against CS Securities. The consequential damages claimed by MBIA are lost opportunities due to payment of claims and maintenance of reserves as a result of breaches of the Insurance Agreement and PSA (complaint 1Í 79 and ad damnum clause). MBIA’s demands for those damages are stricken too.
Damages for lost profits are denied if the contract itself does not provide for their recovery “and no factual issue has been otherwise raised” as to whether the parties intended that they would be able to recover damages due to lost profits. (Brody Truck Rental v Country Wide Ins. Co., 277 AD2d 125, 126 [1st Dept 2000] [emphasis supplied]; see Hold Bros, Inc. v Hartford Cas. Ins. Co., 357 F Supp 2d 651, 657 [SD NY 2005] [interpreting Brody to hold that express provision permitting damages for lost profits is not prerequisite for obtaining such damages].) Damages in an action for breach of contract are intended to restore the injured party to the position he would have been in had the contract been fully performed. (Brushton-Moira Cent. School Dist. v Thomas Assoc., 91 NY2d 256, 262 [1998].) Lost profits are recoverable under this general rule, but only if: (1) it is certain that the loss was caused by the breach; (2) the amount of loss is established with reasonable certainty; and (3) the particular damages were fairly within the contemplation of the parties at the time of entering into the agreement. (Kenford Co. v County of Erie, 67 NY2d 257, 262 [1986].) In determining the contemplation of the parties at the time of entering into the agreement, the nature, purpose, and circumstances of the contract known by the parties should be considered. (BiEconomy Mkt., Inc. v Harleysville Ins. Co. of N.Y., 10 NY3d 187, 193 [2008].)
*780 The demand for consequential damages is stricken. The Insurance Agreement says that MBIA may invoke any remedy available at law or equity “to collect the amounts, if any, . . . due under the Transaction Documents [Insurance Agreement & PSA] or to enforce performance and observance of any obligation, agreement or covenant” of SPS or DLJ under the Transaction Documents (Insurance Agreement § 5.02 [a] at 33). Therefore, the Insurance Agreement evidences the parties’ intentions that money damages are limited to amounts due under the Insurance Agreement and PSA and amounts necessary to enforce MBIA’s rights under those contracts. There are no facts alleged tending to show that the parties contemplated that MBIA could recover lost opportunities for profit or damages caused by increased reserves necessary to pay resulting claims. Further, the PSA clearly limits damages to the Repurchase Protocol for breaches of representations and warranties (PSA § 2.03 at 72).
Jury Trial
The motion to strike MBIA’s demand for a jury trial is granted. Insurance Agreement § 6.09 expressly waives “any right to a trial by jury.” The provision is enforceable. (Tiffany at Westbury Condominium v Marelli Dev. Corp., 34 AD3d 791, 791-792 [2d Dept 2006].) MBIA’s argument, that the jury waiver is contained in the fraudulently induced Insurance Agreement, is unavailing now that the fraudulent inducement claim has been dismissed. Accordingly, it is ordered that defendants’ motion to dismiss the first, second, fourth, fifth, seventh and eighth causes of action is granted solely to the extent that the first cause of action for fraudulent inducement against Credit Suisse Securities (USA) LLC, and the portion of the fourth cause of action for breach of the covenant of good faith and fair dealing as against DLJ Mortgage Capital, Inc., are dismissed; and the motion is otherwise denied; and it is further ordered that defendants’ motion to strike MBIA’s demand for a jury trial and MBIA’s demands for punitive and consequential damages is granted, and MBIA’s said demands are hereby stricken.

. MBIA’s Policy insured the Class 1A-1, 2A-1A, 2A-IF, 2A-2, 2A-3 and 2-A-4 certificates (Policy at 1).

. A copy of the loan tape is available on line at http://www.sec.gov/ Archives/edgar/data/1396301/000088237707001445/d664781-ex4_l.htm.

. The insured certificates fell into Groups 1 and 2 of the loan Groups in the Trust (ProSupp at S-5).

. Net recovery is defined as proceeds received by SPS minus certain unreimbursed expenses and fees (PSÁ § 1.01 at 27).